IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NAREN CHAGANTI,

    Plaintiff,

       v

I2 PHONE INTERNATIONAL, INC, et al,

    Defendants.

No C 04-987 VRW

ORDER

      Naren Chaganti, an attorney representing himself, claims that I2 Phone International, Inc (I2 Phone) and its president, Paul Arena, unlawfully interfered with Chaganti's attorney-client relationship with Supercaller Community, Inc (Supercaller). Chaganti also alleges breach of contract against I2 Phone in its capacity as Supercaller's successor-in-interest. I2 Phone and Arena move to dismiss for lack of subject matter jurisdiction or, alternatively, for summary judgment. Doc #77. Chaganti also moves for summary judgment. Doc #75. For reasons discussed below, the court GRANTS I2 Phone and Arena's motion to dismiss for lack of subject matter jurisdiction and DENIES as MOOT the parties' motions for summary judgment.

I

Chaganti is a patent attorney with a background in telecommunications, computer science and venture capital financing. Doc #75, (Chaganti decl) at ¶¶ 2, 9. Chaganti's relationship with Supercaller began in October 2001, when he met Teng Lew Lim, Chief Executive Officer and principal shareholder of Supercaller, through Darius Mostowfi, Supercaller's Chief Technology Officer. Id at ¶¶ 8, 12. At the time, Supercaller was in the business of creating telecommunications products.

Lim asked Chaganti to assist Supercaller in marketing and engineering and to identify venture capital contacts ("pre-patent work"). Doc #75, Ex 21 (Mostowfi decl) at 2. After providing Lim and Mostowfi several business leads, Chaganti requested payment. Id. Because Supercaller lacked funds, Lim offered 500,000 shares of stock in Supercaller. Doc #75 (Chaganti decl) at ¶ 17. Chaganti approved this arrangement, albeit reluctantly, and sent an email to Mostowfi requesting paperwork for the grant of shares and further requesting that Supercaller's corporate attorney assess the reasonableness of the deal. Doc #75 (Chaganti decl) at ¶¶ 17, 18; Id, Ex 21 (Mostowfi decl) at 2. Supercaller's corporate counsel, James Berg, found the grant of shares to be reasonable, which Mostowfi relayed to Chaganti in an email. Chaganti did not, however, receive a share certificate. Doc #75 (Chaganti decl) at ¶ 18

In May 2002, Supercaller entered into a licensing and marketing agreement with I2 Phone, whereby I2 Phone acquired an ownership interest in Supercaller. Doc #75, Ex 21 (Mostowfi decl)

at 3. As a condition of this arrangement, I2 Phone's president, Paul Arena, became a member of Supercaller's board of directors as a designee of I2 Phone. Doc #85, Ex 1 at 2-3.

In June 2002, Chaganti began prosecuting patents on behalf of Supercaller. Doc #75, Ex 21 (Mostowfi decl) at 3. In particular, Lim and Mostowfi directed Chaganti to file a provisional patent application by July 4; in exchange, I2 Phone would invest funds into Supercaller in order to compensate Chaganti at his hourly rate. Id. Lim and Mostawfi also agreed to retain Chaganti to prepare and file eight utility patent applications and eventually hire him as in-house patent counsel. Id.

Over the next several weeks, Chaganti prepared the provisional patent application with the assistance of an associate. Doc #75, Ex 11 at 1-2, Ex 21 (Mostowfi decl) at 3. On June 26, Chaganti participated in a conference call with Mostowfi, Lim, various officers of I2 Phone and Virginia patent attorney Jon Roberts, whom Arena wanted to be involved in the application process. Doc #75 (Chaganti decl) at ¶¶ 25-26; Doc #75, Ex 1, 2. During this conference call, the parties discussed a private placement memorandum (private offering of securities to limited investors) disclosing the eight patent utility applications and Chaganti and Roberts exchanged contact information. Doc #75 at 3; Doc #75, Ex 1, 2.

On July 2, Roberts contacted Chaganti and asked to help prosecute the utility patents that Chaganti would soon be filing. Doc #75 (Chaganti decl) at ¶ 29; Doc #75, Ex 21 (Mostowfi decl) at 3. Chaganti declined and informed Mostowfi and Lim of Roberts'

offer.  Doc #75 (Chaganti decl) at ¶¶ 29-30; Doc #75, Ex 21 (Mostowfi decl) at 3.  Mostowfi and Lim concluded that Chaganti was better suited for the job, despite Arena's preference that Roberts be involved.  Doc #75, Ex 5, Ex 21 (Mostowfi decl) at 3.  In an email to Arena dated July 2, Lim wrote, "[w]e appreciate the offer of [Roberts'] help but it looks like they are doing well for now."  Doc #75, Ex 5.  Mostowfi and Lim also offered Chaganti a workspace at Supercaller so they could interact with him on a day-to-day basis.  Doc #75, Ex 4, Ex 21 (Mostowfi decl) at 4.

On July 5, Chaganti filed the provisional patent application and forwarded copies to Lim and Mostowfi; both noted they were satisfied with Chaganti's work and asked him to continue drafting the utility applications.  Doc #75, Ex 6, 7, 8, 21 (Mostowfi decl) at 4.  On July 8, Roberts contacted Chaganti, informing him that Arena wanted to know which of the utility applications would be assigned to Roberts' firm.  Doc #75, Ex 9.  Roberts again asked to divide up the work on July 11; Chaganti responded by telling Roberts that he could handle the job himself and that it was improper to make such a request without the approval of Supercaller.  Doc #75 (Chaganti decl) at ¶ 42; Doc #75, Ex 9.

Later that day, Arena contacted Lim and Mostowfi and demanded the discharge of Chaganti and the assignment of the utility applications to Roberts.  Doc #75, Ex 21 (Mostowfi decl) at 4.  Soon thereafter, Mostowfi called Chaganti and told him to cease all work because Arena had threatened to withhold investment funds if Supercaller continued to work with Chaganti.  Doc #75 (Chaganti

4

decl) at ¶¶ 43-44; Doc #75, Ex 21 (Mostowfi decl) at 4.  Chaganti complied with Mostowfi's request and immediately sent an email to Mostowfi confirming the request.  Doc #75, Ex 10.  On July 15, Chaganti mailed Supercaller a bill for $46,744.50, encompassing work for the provisional patent application and research and preparation for the utility applications.  Doc #75, Ex 11.  In response to Chaganti's demand for payment, Mostowfi suggested in a July 16 email that Chaganti would be paid eventually.  Doc #75, Ex 12.  On September 14, Dan Kern, an attorney for Supercaller and I2 Phone, offered $7,000 to Chaganti for services rendered and to "[release] fully both Supercaller and I2 Phone International * * * against any and all claims * * *."  Doc #75, Ex 14.  Chaganti rejected the offer.  Doc #75 (Chaganti decl) at ¶ 54.

On December 31, 2002, Supercaller and I2 Phone merged to become I2 Telecom International, Inc (I2 Telecom).  Doc #75, Ex 17 at 1.  On February 21, 2003, Chaganti filed an action for tortious interference with attorney-client relationship against I2 Phone and Arena.  Chaganti also alleged breach of contract against I2 Phone in its capacity as Supercaller's successor-in-interest.  Doc #26.  Although this action was originally before Judge Breyer, it was found to be related to <u>Mostowfi v I2 Telecom Int'l, Inc</u>, C-03-5784 VRW, a case involving numerous business torts against a group of defendants, including I2 Phone and Arena, in which Chaganti served as plaintiffs' counsel.  Doc #3.

On August 13, 2004, I2 Phone and Arena moved to dismiss, which this court denied.  Doc #28; Doc #35.  In May 2007, I2 Phone and Arena moved to dismiss for lack of subject matter jurisdiction

5

or, alternatively, for summary judgment, Doc #77, and Chaganti moved for summary judgment. Doc #75.

II

The court must first address the motion to dismiss for lack of subject matter jurisdiction. See <u>Ruhrgas Ag v Marathon Oil Co</u>, 526 US 574, 578 (1999) ("Customarily, a federal court first resolves doubt about its jurisdiction over the subject matter * * *."). Federal courts have limited subject matter jurisdiction and, unless jurisdiction is authorized by the Constitution or a statute, a federal court is presumed to lack jurisdiction. <u>Kokkonen v Guardian Ins Co of America</u>, 511 US 375, 377 (1994); <u>National Treasury Employees Union v Fed Labor Relation Authority</u>, 112 F3d 402, 404 (9th Cir 1997). The burden of establishing otherwise rests on the party asserting jurisdiction. <u>Kokkonen</u>, 511 US at 377; <u>Tosco Corp v Communities for a Better Environment</u>, 236 F3d 495, 499 (9th Cir 2001); <u>St Clair v City of Chico</u>, 880 F3d 199, 201 (9th Cir 1989) (finding that it is "necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction").

Unlike other defenses that may be raised pursuant to motions under Rule 12(b), defects in subject matter jurisdiction cannot be waived by the parties and may be raised at any time during the proceedings or even sua sponte by the court. <u>Fox v Board of Trustees of the State University of New York</u>, 42 F3d 135, 140 (2d Cir 1994); <u>Prescott v United States</u>, 973 F2d 696, 701 (9th

6

Cir 1992). Rule 12(h)(3) allows the court to dismiss a case "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter."

In determining whether a challenge to subject matter jurisdiction is warranted under FRCP 12(b)(1), the court need not accept the factual allegations in the complaint as true. <u>Thornhill Publishing Co v General Telephone & Electronics Co</u>, 594 F2d 730, 733 (9th Cir 1979); see also <u>Thigpen v United States</u>, 800 F2d 393 396 (4th Cir 1986). If the jurisdictional issue is separable from the merits of the case, the court may consider the evidence presented with respect to the jurisdictional issue and resolve factual disputes where necessary to the determination of jurisdiction. <u>AAMC</u>, 217 F3d at 778; <u>Augustine v United States</u>, 704 F2d 1074, 1077 (9th Cir 1983). If the jurisdictional issue involves factual issues going to the merits of the underlying claim, the court should employ the standard applicable to a motion for summary judgment. <u>Augustine</u>, 704 F2d at 1077; <u>Thornhill</u>, 594 F2d at 733-35. That is, the evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 US at 255.

### III
#### A

I2 Phone, as Supercaller's successor-in-interest, first argues that no enforceable contract formed between Chaganti and Supercaller because the alleged agreement violates California Business & Professions Code § 6148(a), which regulates attorney-

7

client relationships, and the terms of payment are indefinite. With respect to the grant of Supercaller shares, I2 Phone contends the agreement lacks consideration and constitutes a contingency fee arrangement in violation of California Business & Professions Code § 6147. Doc #77 at 6-12. Chaganti contends that an implied-in-fact contract existed between the parties and, in the alternative, seeks summary judgment for compensation under quantum meruit. Doc #75 at 5, 7.

Because this action was brought under diversity jurisdiction, California contract law governs this case. St Paul Fire and Marine Ins Co v Weiner, 606 F2d 864, 867 (9th Cir 1979). The elements of a cause of action for breach of contract are: (1) a contract; (2) plaintiff's performance; (3) defendant's breach and (4) damage to plaintiff therefrom. McDonald v John P Scripps Newspaper, 210 Cal App 3d 100, 104 (1989).

Preliminary negotiations or an agreement for future negotiations do not amount to an enforceable agreement. Kruse v Bank of America, 202 Cal App 3d 38 (1988). In order for a contract to form, there must be a meeting of the minds with an intent to be bound by a legally enforceable agreement. Weddington Productions, Inc v Flick, 60 Cal App 4th 793, 811 (1998). The parties must mutually assent to a sufficiently definite offer so that upon acceptance, the parties' obligations are reasonably certain. See id. An offer must clearly articulate the terms of the agreement and the acceptance must be absolute, unqualified and a mirror image of the offer. See Panagotacos v Bank of America, 60 Cal App 4th 851, 855 (1998). "The existence of mutual assent is determined by

8

objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." Meyer v Banko, 55 Cal App 3d 937, 942-43 (1976).

The court first addresses the claim for breach of contract with respect to the fees for Chaganti's work on the provisional and utility patent applications. In relying on California Business and Professions Code § 6148, I2 Phone refashions an argument this court already rejected. Section 6148 provides in part:

> (a) In any case * * * in which it is reasonably foreseeable that total expense to a client, including attorney fees, will exceed one thousand dollars * * * the contract for services in the case shall be in writing.
> * * *
> (c) Failure to comply with any provision of this section renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee.

Doc #29 at 5.

The court draws I2 Phone's attention to sub-section (d), which provides in part:

> This section shall not apply to any of the following:
>
> * * *
> (4) <u>If the client is a corporation</u>.

(emphasis added). Because Supercaller was a California corporation, the court (once again) rejects I2 Phone's reliance on section 6148.

Next, I2 Phone asserts that the terms of any agreement it had with Chaganti are indefinite, arguing that negotiations regarding compensation never resulted in specific payment terms.

9

Doc #77 at 9-11.  In support, I2 Phone cites Chaganti's deposition testimony:

> Q: Did you have a discussion with anyone at [Supercaller] either in that first initial meeting or thereafter as to how you would be compensated?
>
> A: Yes.
>
> Q: And please describe for me what was said in that portion of the conversation.
>
> A: * * * If I were to do a substantial amount of work up front and I was not going to get paid in cash, then equity would be substantially more.  On the other hand, if I were to be paid a lower hourly rate, then I offered to give them – take a smaller equity * * *.  One, I wasn't really clear as to their financial situation in the sense that how much money they had in the bank.  They never told me.  So I gave a panoply of options saying on the one hand I could come in house and become a general counsel for the company.  They could pay me hourly fee and then put me on the equity thing, and also possibly on the board of directors.  And the other extreme is purely pay me by the hour at the going rate.
>
> Q: When you started doing the patent application for Supercaller * * * you weren't sure if it was going to be a flat-fee matter or an hourly matter because the agreement had been written but not signed?
>
> A: Let me put it this way.  My mental state was, this is an hourly thing at the time I started, but if they came back sometime during that period or soon thereafter saying, whoops, we made a mistake, we got our funding, here is your 40 grand, take this money, I probably would have – in order to maintain an ongoing relationship with these guys, probably would have done that and canceled the * * * hourly thing, and written off any excess hours * * *.

Doc #77, Ex 1 at 26:12-25, 27:1-11, 62:19-25, 63:1-11.

Chaganti counters with a declaration from Mostowfi, which lends support to the contention that Chaganti was to be compensated

10

for the provisional patent application and the subsequent utility patents.

> Before [Chaganti] started representation of Supercaller as a lawyer in June 2002, Lew Lim and I agreed on behalf of Supercaller that we would pay [Chaganti] his hourly fees and expenses for the preparation and filing. Lew Lim and I also agreed that [Chaganti] would prepare and file 8-9 utility applications based on the disclosure in the provisional application.

Doc #75, Ex 21 (Mostowfi decl) at 3. Further support is found in Mostowfi's July 16 email, which suggested that Chaganti's invoice would be paid eventually. Doc #75, Ex 13.

In view of the conflicting evidence, and drawing all justifiable inferences in favor of Chaganti, the court cannot conclude as a matter of law that no contract formed for work on the provisional and utility patent applications.

With respect to Chaganti's pre-patent work and the alleged offer of 500,000 shares to Chaganti, I2 Phone contends the agreement lacks consideration, relying on <u>Passanti v McWilliam</u>, 53 Cal App 4th 1240 (1997). Doc #77 at 11-12. In <u>Passanti</u>, a corporate attorney secured financing for a company and later sued after the company reneged on its promise to grant corporate stock to the attorney. The promise lacked consideration, the court found, because the stock was not bargained for in exchange for securing financing; the attorney secured the financing before the stock reward was ever mentioned. Because "past consideration is no consideration," the promise was unenforceable. <u>Passanti</u>, 53 Cal App 4th at 1247-48.

As in <u>Passanti</u>, 53 Cal App 4th at 1247-78, Chaganti completed the relevant services before securing the promise for

11

Supercaller shares. Lim and Mostowfi, acting on behalf of Supercaller, may have agreed in March 2002 to grant 500,000 shares of Supercaller to Chaganti, but they did so after Chaganti performed the pre-patent work. Doc #75, Ex 21 (Mostowfi decl) at 2. Chaganti conceded as much in his deposition:

> Q: Did you come to a conclusion as to how you would get paid for what you characterized as the in-house counsel services? Was that what the 500,000 shares of stock was for?
>
> A: 500,000 shares was – yeah, that is the type of services that – they made me some trademark searches, for example. Didn't pay me. * * * [T]hey said, "We are tight on cash, so we want to give you this thing." I said, "Okay, for these type of service * * * [I] <u>have already done</u>, I'll take these shares * * *."

Doc #77, Ex 1 at 39:8-23 (emphasis added). Because past consideration cannot be bargained for, the court concludes that any agreement granting 500,000 shares to Chaganti is not enforceable.

Alternatively, Chaganti claims that even if no enforceable contract formed, he may obtain recovery for his pre-patent work under quantum meruit. Doc #75 at 8. Quantum meruit, "is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." <u>In re De Laurentiis Entertainment Group, Inc</u>, 963 F2d 1269, 1272 (9th Cir 1992) (applying California law). "Quantum meruit is based not on the intention of the parties, but rather on the provision and receipt of benefits and the injustice that would result to the party providing those benefits absent compensation." Id. To succeed on such a theory, Chaganti must establish that he rendered services to Supercaller's

United States District Court
For the Northern District of California

benefit such that Supercaller would be unjustly enriched if Chaganti were not compensated. Id. Under California law, Chaganti and Supercaller need not be in contractual privity with each other; nor is it necessary that Supercaller expected to pay Chaganti. Rather, Chaganti must establish that the services he performed were not intended to be gratuitous. See id.

Although the promise for shares lacks consideration, Chaganti may still have a claim that his pre-patent services benefitted Supercaller and that Supercaller would be unjustly enriched if Chaganti is not compensated. Chaganti's deposition testimony concerning these pre-patent services is as follows:

> Q: At the point in time where you had the meeting at the Polaris Avenue address with Mr Lim and Mr Mostowfi in March or April of 2002, how many hours had you spent working on tasks for Limcom/Supercaller?
>
> A: By that time?
>
> Q: Yes.
>
> A: Maybe 20.  Maybe it's more than 20 actually. Maybe close to 40, 50 hours.
>
> Q: Had you ever asked them to pay you?
>
> A: I have repeatedly asked them to pay * * *

Doc #77, Ex 1 at 34:1-8, 38:19-20.

I2 Phone fails on the present record to rebut Chaganti's claim that his services were not intended to be gratuitous.

B

Chaganti also alleges that I2 Phone and Arena wrongfully induced Supercaller to breach its contractual obligation concerning the provisional patent applications and interfered with Chaganti's

13

prospective business relations with Supercaller. Doc #26 at 4-5. Under California tort law, general principles regarding tortious interference claims are applicable in the attorney-client context. Frazier v Boccardo, 70 Cal App 3d 331, 338 (1977). "The fact that the relationship between an attorney and client is 'at-will' does not prevent an inducement to terminate the contractual relationship from being actionable, irrespective of whether the agreement was written or oral." Pacific Gas & Electric Co v Bear Stearns & Co, 50 Cal 3d 1118, 1127 (1990).

I2 Phone and Arena first assert they cannot be held liable for tortious interference because they were not third parties to the contract between Chaganti and Supercaller, as Arena was a board member of Supercaller and I2 Phone held an economic interest in Supercaller. Doc #77 at 13-15; Doc #75, Ex 21 (Mostowfi decl) at 2; Doc #85, Ex A at 2-3.

A long-recognized principle in actions for tortious interference with a contract or economic relationship is that a claim will not lie against a party to the contract or relationship. Woods v Fox Broadcasting Sub, Inc, 129 Cal App 4th 344, 350-51 (2005). If the defendant is a party to the contract or relationship, "* * * the grievance of the plaintiff is, in essence, breach of contract." Dryden v Tri-Valley Growers, 65 Cal App 3d 990, 999 (1977); see Kasparian v County of Los Angeles, 38 Cal App 4th 242, 262 (1995). Absent a privilege or justification, however, contract or prospective economic advantage interference claims may lie against owners, officers, shareholders and directors of an entity whose contract or economic relationship is the subject of

14

the litigation. Woods, 129 Cal App 4th at 356. Hence, the law regards Arena and I2 Phone as third parties with respect to Chaganti's alleged contract with Supercaller and they may be subject to claims for tortious interference.

Next, Arena and I2 Phone assert that even if their conduct induced a breach of the alleged agreement between Chaganti and Supercaller, they were privileged to act in such manner. Doc #77 at 13-14. "The determination * * * whether the privilege applies in a particular instance requires a two step analysis. The first step is to determine if the relationship between the parties involves the type of interests that the privilege is designed to protect. The second step is to determine whether, in light of the nature and importance of the above relationship, the advisor's intent in inducing the breach was proper. Los Angeles Airways, Inc v Davis, 687 F2d 321, 325 (9th Cir 1992) (applying California law).

An owner, shareholder, officer or manager of an entity enjoys a qualified privilege to induce an otherwise tortious breach of contract if he reasonably believes the contract to be harmful to the entity's best interests. Wanland v Los Gatos Lodge, Inc, 230 Cal App 3d 1507, 1522 (1991). Although the extent to which motive or state of mind goes into determining whether the inducement was done with the proper intent is "somewhat muddled in California law," Aalgaard v Merchants Nat Bank, Inc, 224 Cal App 3d 674, 684 (1990), the Ninth Circuit in Los Angeles Airways, Inc, 687 F2d at 328, concluded that an officer, agent, manager or shareholder may claim the privilege "as long as he was motivated, at least in part, by a desire to benefit the company." See id (emphasis added).

15

Resolving ambiguity in favor of a defendant, the Ninth Circuit reasoned, is necessary for the managers privilege to serve its purpose of "fostering uninhibited advice." Los Angeles Airways, Inc, 687 F2d at 328.

Applying these principles, Arena, on behalf of I2 Phone, need not have been acting solely in Supercaller's interest; all that is required is evidence that Supercaller's interest was one of the factors motivating his actions that led to the disruption of Chaganti's relationship with Supercaller. See id; see also Wanland, 230 Cal App 3d at 1522. Arena provides ample evidence to satisfy this standard. Arena declares that I2 Phone's attorney Jon Roberts advised him that Chaganti was failing to prepare the patent applications competently and timely, thereby jeopardizing Supercaller's intellectual property. Doc #85, Ex A at 2. Id. Arena claims that "he suggested, and the board of directors voted as a whole, to terminate [Chaganti's] services because of dissatisfaction with [Chaganti's] provisional patent." Id.

Chaganti's response misses the mark. It matters not that Mostowfi and Lim were satisfied with Chaganti's patent work, see Doc #75, Ex 8. Under the managers privilege, what matters is Arena's intent, for the underlying issue is whether Arena was motivated, at least in part, by a desire to benefit Supercaller. See id. Arena's good faith concern about Chaganti's performance merits protection under the managers privilege.

//
//
//

**16**

C

Having assessed Chaganti's claims, the court must determine whether the amount of fees sought in this action meets the jurisdictional amount in controversy requirement. Doc #77 at 16. District courts have jurisdiction in diversity cases so long as the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 USC § 1332(a); Crum v Circus Circus Enterprises, 231 F3d 1129, 1131 (9th Cir 2000). Generally, the amount in controversy is determined from the face of the pleadings. See Pahinger v MGM Grand Hotel-Las Vegas, Inc, 802 F2d 362, 363 (9th Cir 1986), and the sum claimed by the plaintiff controls so long as the claim is made in good faith. Paul Mercury Indem Co v Red Cab Co, 303 US 283, 288 (1938). To justify dismissal, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." Id at 289.

A more exacting standard, however, is imposed when the amount of controversy is challenged by a motion for summary judgment. See William W Schwarzer, et al, Federal Civil Procedure Before Trial 9:90-91 (Rutter Group Practice Guide 2001).

> Were this a threshold motion to dismiss the complaint for want of subject matter jurisdiction, [plaintiff] would be entitled to the speculative benefit of any facts he might conceivably prove in support of his well-pleaded allegations. On a motion for summary judgment, though, he is not entitled to hold back his heavier fire for the ultimate trial -- for it may never come. Accordingly [plaintiff] may properly be accorded the benefit of favorable inferences only from established facts and from his own asserted facts (accepted as true for these purposes) -- no more.

United States District Court
For the Northern District of California

17

<u>**Farmilant v Singapore Airlines, Ltd**</u>, 561 F Supp 1148, 1151 (ND Ill 1983) (Shadur, J), citing <u>**Walker v Hoffman**</u>, 583 F2d 1073, 1075 (9th Cir 1978).

As Chaganti claims $46,445.25 for the value of the patent prosecution services rendered to Supercaller, Doc #26, this court's subject matter jurisdiction turns on whether Chaganti could recover the remaining $28,554.75 under quantum meruit for his pre-patent services. In deposition, Chaganti testified that before working on the patents, he billed between twenty to fifty hours rendering an array of services to Supercaller, including engineering issues, trademark research and helping Supercaller find "distribution channels" and investors. Doc #77, Ex 1 24:8-20, 34:1-15, 37:15-17, 39:12-15, 69:4-13. Chaganti's bill for services — attached to Doc #77 (Diemer decl), Ex B — lists his hourly rate at $275. See also Doc #77, Ex A at 27 (Chaganti depo) (testifying that the quoted rate was $275-300/hr).

Even if the court draws all justifiable inferences in Chaganti's favor and credits him for 50 hours of pre-patent services, his quantum meruit claim would amount to $13,750 — not enough to put Chaganti over the $75,000 jurisdictional minimum. In order for Chaganti to reach that amount, his hourly rate would have to be over twice what he quoted Supercaller and charged in the July 15, 2002, invoice. While some lawyers now charge hourly rates at and above that level ($571/hour), it is a legal certainty that Chaganti did not in his billing charge less than what he regarded as the value of his services. Chaganti has thus failed to meet the jurisdictional threshold required under 28 USC § 1332.

18

IV

In sum, the court GRANTS I2 Phone and Arena's motion to dismiss for lack of subject matter jurisdiction and DENIES as MOOT. the parties' cross-motions for summary judgment.  The clerk is directed to close the file and terminate all motions.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge